**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 02 CR 661** |
| | ) | |
| **WAYNE STEPHENS** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

A jury convicted Wayne Stephens of wire fraud. For the reasons stated below, the Court grants Stephens a new trial.

**Background**

On February 21, 2003, a jury convicted Stephens, an African-American man, on three counts of wire fraud for obtaining allegedly unauthorized cash advances from his employer, Accenture. The jury *venire* summoned for Stephens' case consisted of forty persons: thirty-one Caucasians, four African-Americans, four Hispanic-Americans, and one Asian-American. The Court excused nine members of the panel for cause (hardship or inability to be fair): eight Caucasians and one African-American. That left thirty-one prospective jurors: twenty-three Caucasians, three African-Americans, four Hispanic-Americans, and one Asian-American.

Following our rulings on the cause challenges, the Court gave each side time to prepare a list of the prospective jurors it wished to challenge peremptorily. In accordance with our usual practice, each side prepared its list without knowing which jurors the other side was challenging. Because the Court was selecting two alternate jurors, the government had seven peremptory challenges, and Stephens had eleven. *See* Fed. R. Crim. P. 24(b)(2) & (4)(A).

The government initially exercised five of its seven challenges, using all five to strike members of racial and ethnic minority groups: two African-Americans, two Hispanic-Americans, and one Asian-American. Stephens exercised all eleven of his challenges, striking nine Caucasians, the remaining African-American, and one of the Hispanic-Americans whom the government had stricken. The Court advised the parties that there had been an overlapping challenge. Because the government had not used all of its peremptory challenges, the Court advised the government that it could use an additional strike. The government did so, striking another Hispanic-American from the jury panel. The government did not use its seventh strike.

In short, the government used all six of the strikes it exercised to excuse members of racial and ethnic minority groups. Stephens' appointed trial counsel interposed no challenge to any of the government's peremptory strikes. As a result of the parties' peremptory challenges, the jury that heard and decided Stephens' case consisted of eleven Caucasians – four women and seven men – and one Hispanic-American woman. Two Caucasians served as alternates. As indicated earlier, the jury convicted Stephens on all of the charges against him.

After Stephens was convicted, his trial counsel moved for a judgment of acquittal, raising various issues but no attack on the government's use of its peremptory challenges. Later, during the Court's consideration of Stephens' motion, we raised *sua sponte* the issue of whether the government had exercised some or all of its peremptory challenges to exclude racial or ethnic minorities from the jury, in violation of *Batson v. Kentucky,* 476 U.S. 89 (1986), and its progeny. The Court initially ordered the government to explain each of its strikes. The government moved for reconsideration of that order, arguing that the Court lacked jurisdiction to raise the issue. The Court granted the government's motion and vacated the order, concluding that we

lacked the authority to raise a basis for a new trial once the deadline for the defendant to file a motion for a new trial had passed. *United States v. Stephens,* No. 02 CR 661, 2003 WL 21439862, at \*1-2, 4-5 (N.D. Ill. June 20, 2003). The Court denied the motion for new trial filed by Stephens' counsel.

New counsel was appointed to represent Stephens on appeal, and the new attorney raised the *Batson* issue in Stephens' opening appeal brief. The government elected to waive the argument that Stephens had forfeited his *Batson* objection. As a result, the Court of Appeals considered the issue on its merits. The Court of Appeals concluded that Stephens had established a *prima facie* case of discrimination under *Batson* and remanded the case to this Court for determination of the government's reasons for its peremptory challenges and evaluation of whether those reasons were a pretext for intentional discrimination. *United States v. Stephens,* 421 F.3d 503, 518 (7th Cir. 2005). Following remand, the parties briefed the remaining issues extensively, making the matter ripe for decision.

## Discussion

To determine whether a party has used a peremptory challenge to exclude a prospective juror on the basis of race or national origin, a court engages in a three step inquiry. The party alleging the violation must first make a *prima facie* showing of discrimination. Once such a showing is made, the party that exercised the peremptory challenge must articulate a non-discriminatory reason for the challenge. If this is done, then the party alleging the violation bears the burden of proving intentional discrimination. *See Batson,* 476 U.S. at 95-96. At this stage, the party alleging the violation "may offer additional evidence to demonstrate that the [other party's] proffered justification was pretextual or to otherwise establish that the peremptory

strike was motivated by a discriminatory purpose." *Stephens,* 421 F.3d at 510 (citing

*Batson,* 476 U.S. at 98). The showing must be made by a preponderance of the evidence. *See*

*Rodriguez v. Schriver*, 392 F.3d 505, 509 n. 8 (2d Cir. 2004) (citations omitted); *McKinney v.*

*Artuz,* 326 F.3d 87, 98 (2d Cir. 2003); *Roberts ex. rel. Johnson v. Galen of Va., Inc.*, 325 F.3d

776, 780 (6th Cir. 2003) (citations omitted).[1]

Because the Seventh Circuit has already ruled that Stephens has made the necessary

*prima facie* showing, we begin with the government's stated approach to jury selection in this

case. The government says "there were two factors that [it] considered to be particularly

significant" in exercising its peremptory challenges: "(1) the juror's work experience; and (2)

the juror's ability to understand the government's case." Govt's Statement of Reasons at 2.

As to its first stated criterion, the government says that

> [a] critical piece of the case against Stephens relied on arguments about
> the norms of a white collar work environment. The government believed
> that jurors who understood those norms from their own work experience
> would readily understand that no employee of Accenture could believe
> that Accenture permitted Stephens' actions. Conversely, the government
> was concerned that jurors who lacked white collar experience would be
> more vulnerable to Stephens' anticipated argument about what he believed
> Accenture permitted. Accordingly, the government used its peremptory
> challenges to strike, with one exception, individuals who lacked white
> collar work experience.

*Id.* at 3-4.

As to its second stated factor, the government notes that its case was largely

---

[1] Stephens sought an evidentiary hearing so that he could cross-examine the government
regarding the actual reasons for its peremptory strikes. The government objected, arguing that
Stephens had ample opportunity to review trial transcripts, audiotapes of jury selection, juror
questionnaires, and the government's notes. The Court agreed with the government and declined
to conduct an evidentiary hearing.

circumstantial and that some of the inferences it relied upon were technical and complicated, and as a result it was "concerned that jurors who did not comprehend these arguments would conclude that the government had not met its significant burden of proof." *Id.* at 6. The government says that one way it assessed the jurors' ability to understand its case

> was to look at their level of education. The government assumed that people with college degrees would be more likely to understand all the nuances of the government's case than people who had less education. Accordingly, as a general rule, the government looked to strike individuals who lacked a college degree.

*Id.* at 7 (citations omitted). The government says that it "also placed significant weight on mistakes the jurors made in their written and oral responses during *voir dire* when assessing the jurors' ability to understand the government's case." *Id.* "[I]f an individual made repeated and/or glaring mistakes during *voir dire,* the government viewed that as compelling evidence of the juror's inability to understand the government's case." *Id.* at 8.

The two criteria the government cites as its primary motivating factors in exercising its peremptory challenges are both "'clear and reasonably specific,'" and are, on their face at least, race-neutral and national origin-neutral. *See Miller-El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 2324 (2005) (quoting *Batson,* 476 U.S. at 98 n.20); *Hernandez v. New York,* 500 U.S. 352, 360 (1991).

This is not, however, the end of the story; the Court is required to assess the government's stated reasons for its actions in determining whether the defendant has met his burden of proving that the government intentionally discriminated. *See Miller-El,* 125 S.Ct. at 2331. This third step of the *Batson* inquiry focuses on whether the government's articulated reasons hold up under close scrutiny. The Court's finding on whether the government exercised a peremptory challenge in a discriminatory manner "largely ... turn[s] on evaluation of

credibility," *Hernandez,* 500 U.S. at 365, which "can be measured by how reasonable, or how improbable [the government's] explanations are, and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El,* 125 S.Ct. at 2329. As noted earlier, the third step of the *Batson* inquiry typically consists of assessing whether the stated justification for the government's action is pretextual. *Batson,* 476 U.S. at 98; *Stephens,* 421 F.3d at 510.

Even if some of the government's peremptory challenges were justifiable, that does not immunize the others from scrutiny. Stephens' conviction must be reversed "if even one potential juror [was] excluded for impermissible reasons." *Coulter v. Gilmore,* 155 F.3d 912, 919 (7th Cir. 1998) (citing *J.E.B. v. Alabama,* 511 U.S. 127, 142 n. 13 (1994)). Because the "right to nondiscriminatory jury selection procedures belongs to the potential jurors, as well as to the litigants," "[t]he exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system." *See J.E.B.*, 511 U.S. at 142 n. 11. *Id.*

The Court rejects Stephens' facial attack on the criteria cited by the government. Stephens argues that the government cannot, consistent with the Constitution, systematically strike working-class jurors. *See Thiel v. Southern Pacific Co.,* 328 U.S. 217, 222-25 (1946) (wholesale exclusion of working class from jury *venire* violates equal protection). This argument confuses the standards for assessing exclusions of groups from the jury *venire* with those for assessing the exercise of peremptory challenges against members of the *venire*. The Supreme Court has made it clear that "[p]arties may exercise their peremptory challenges to remove from the *venire* any group or class of individuals normally subject to 'rational basis' review,'" *J.E.B.,* 511 U.S. at 143, a category that unquestionably includes blue collar jurors and

those without college educations.  Indeed, the Seventh Circuit has consistently upheld

peremptory challenges based on education and work experience.  *See, e.g., Alverio v. Sam's*

*Warehouse Club, Inc.,* 253 F.3d 933, 940 (7th Cir. 2001); *United States v. Marin,* 7 F.3d 679,

686-87 (7th Cir. 1993).  *See also, United States v. Tucker,* 773 F.2d 136, 141 (7th Cir. 1985)

(holding lack of education and commercial experience were race-neutral reasons for peremptory

strikes in wire fraud case).

The Court does not find credible, however, the government's contention that the two

factors it cites are what *actually* motivated its peremptory challenges.  Upon review of the

evidence, the Court agrees with Stephens' argument that the government's actions are

inconsistent with its stated justifications and that the government applied its stated criteria

unevenly as between members of racial and ethnic minority groups on the one hand, and

Caucasians on the other.  For these reasons, the Court concludes, after assessing the evidence,

that Stephens has shown by a preponderance of the evidence the factors the government cites are

a pretext for discrimination based on race and national origin as to at least some, and perhaps all,

of the jurors it struck peremptorily.

In this regard, the Court recognizes that there is no such thing as a two-dimensional juror.

"Picking jurors is a complex and multifaceted process.  Individual factors or characteristics often

do not provide the 'silver bullet' that will mean acceptance or rejection of any potential juror.

Rather, it is a combination of factors that will determine whether a party believes a juror will be

favorable to their side." *Pruitt v. McAdory,* 337 F.3d 921, 930-31 (7th Cir. 2003).[2]  But the

---

[2]  The fact that no person is two-dimensional also makes it relatively easy to posit, after the fact, grounds for differentiating one juror from the other, even if those were not the grounds actually used by the party in jury selection.

government has cited these two criteria as, in its own words, the "two factors that [it] considered to be particularly significant" in exercising its peremptory challenges. Again, the key inquiry under the third step of the *Batson* analysis is whether "the proffered justification was pretextual." *Stephens,* 421 F.3d at 510 (citing *Batson,* 476 U.S. at 98). Thus it is appropriate to begin, and perhaps to end, with assessment of whether the record reflects that the government's stated criteria are actually the criteria it applied, or whether those criteria are a pretext for discriminatory exercise of the government's peremptory challenges.

If one takes at face value the government's identification of the factors it "considered to be particularly significant," after cause challenges were ruled upon, there were eleven prospective jurors who both (a) lacked white collar work experience and (b) lacked a college degree or allegedly showed confusion in the written and oral *voir dire*. Specifically, there were eleven prospective jurors "lack[ing] white collar work experience," Govt's Statement of Reasons at 4: jurors 1, 9, 11, 12, 15, 16, 20, 21, 26, 27, and 36. Each of these jurors also "lacked a college degree," *id.* at 7, though two of them, jurors 15 and 20, were attending college at the time of jury selection.[3] The jurors who the government contends exhibited some degree of confusion during jury selection – jurors 9, 21, and 36 – are among this same group. In short, there were eleven jurors who failed to meet the government's key criteria for jury membership. Of these, six were Caucasian (jurors 11, 12, 15, 16, 20, and 26); two were African-American (jurors 27 and 36); and three were Hispanic-American (jurors 1, 9, and 21).

---

[3] Juror 20 was a fifty year old "shift advisor" at Midwest Generation, a successor of Commonwealth Edison Co.; the government treats him, accurately, as a blue collar juror, albeit one who was attending college at the time of trial. *See* Gov't Reply at 8. Juror 15 was a twenty-three year old male who had a blue collar job but likewise was attending college at the time of trial.

As the government accurately points out, the number of prospective jurors who fit the government's stated criteria for exclusion exceeded the number of peremptory challenges it had available. Thus the government necessarily would have had to use additional criteria to distinguish among the eleven prospective jurors identified above to determine which ones to strike. The key problem with the government's explanation, however, derives from what is essentially the flip side of this same point: the government did not use the peremptory strikes that it had available to excuse as many jurors as possible that met its stated criteria for exclusion. As discussed below, this is powerful evidence that the government's stated criteria are pretextual, or to put it another way, are not the true reasons for the peremptory strikes the government made. *See Volovsek v. Wisc. Dept. of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 692 (7th Cir. 2003) (defining pretext in the Title VII sex discrimination context); *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (defining pretext in the Americans with Disabilities Act context).

If the government had acted consistently with its stated key criteria, it would have used all seven of its available challenges to strike jurors who lacked a college degree and white collar work experience. But instead, the government initially struck only four of the nine jurors who failed to meet its key criteria: jurors 1, 9, 27, and 36.[4] *Each one of these jurors was a member of a racial or ethnic minority:* jurors 1 and 9 were Hispanic-American, and jurors 27 and 36 were African-American. In addition, the government used one of its challenges to strike juror 10, a

---

[4] Though the defense struck one of the nine jurors in question, juror 11, a white male, this does not help the government; as noted earlier, each side prepared its list of peremptory strikes in the blind, without knowing who the other side was striking. The government also notes that the defense also struck juror 1, a Hispanic-American female, but again this misses the point: we are assessing the government's challenges here.

woman with a white collar job who had obtained a college degree and attended graduate school and who accordingly did not meet either of the government's stated criteria for exclusion. Juror 10 was also a member of an ethnic minority: she was Asian-American. Finally, and significantly for present purposes, the government left two of its available challenges unused in the initial go-round. Had the government *actually* been acting in accordance with its stated criteria, it would have used these available challenges to strike two among the several remaining prospective jurors who lacked white collar work experience and a college degree. But it did not do so.

When the government was told it could exercise an additional challenge, six of the jurors who met its stated criteria for exercise of a strike remained on the panel: jurors 12, 15, 16, 20, and 26, all of whom were Caucasian, and juror 21, who was Hispanic-American. The government used its additional challenge to excuse juror 21, the single member of this remaining group who was a member of an ethnic minority group.

To summarize, of the eleven prospective jurors who met the government's claimed criteria for exclusion, five were left on the jury. All five were white males. The government could have excused two of the five had it actually been acting in conformity with its key criteria, but instead it used one of those strikes to excuse an Asian-American juror with white collar employment and a college degree, and it left the other strike on the table without using it.

In short, the government's claim regarding the key criteria it used is contrary to the actions it took during the jury selection. The Court does not find credible the government's contention that it applied those criteria but rather finds that they are being used as a pretext for prohibited discrimination.

We also note that even if the government did in some way apply those criteria during jury selection, it applied them only to prospective jurors who were from racial and ethnic minority groups. Each of the five strikes the government exercised against a non-white collar, non-degreed juror was used against a member of a minority group – as we have stated, two African-Americans, three Hispanic-Americans, and one Asian-American. The government did not exercise peremptory challenges against a single one of the six Caucasian jurors – jurors 11, 12, 15, 16, 20, and 26 – who lacked both a college degree and white collar work experience. When a decision maker's actions do not comport with its stated reasons – and the actions fall more heavily on members of racial or ethnic minorities – that is evidence the stated reasons are a pretext for unlawful discrimination. *See Miller-El*, 125 S.Ct. at 2325-32 (finding prosecutor's proffered reasons for striking African-American jurors were pretextual where they were equally applicable to Caucasian and Hispanic-American jurors who were not challenged). Similarly, a decision maker's application of stated criteria to members of a racial or ethnic minority but not to Caucasians is strong evidence of discrimination. *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290-91 (1999) (reversing grant of summary judgment in Title VII race discrimination case because employer had fired African-American employee for gross misconduct but had retained Caucasian employee who engaged in comparable conduct); *see also Coulter*, 155 F.3d at 921 (finding that trial court erred in rejecting *Batson* challenge where it failed to consider prosecutor's acceptance of Caucasian jurors who had the same characteristics as excluded African-American jurors).

The Court is unpersuaded by the government's argument that the fact that it did not strike two jurors who were members of minority groups supports its contention that it did not exercise

any peremptory challenges based on race or national origin. The government cites its acceptance of Juror 4, a Hispanic-American woman with an associate's degree who had worked at three white collar jobs, and Juror 13, an African-American woman who had earned an MBA degree and had worked at several white collar jobs.[5] *See* Gov't Reply at 9-10. The government contends that had it been motivated by race, it would have used its remaining peremptory challenge to strike one of these jurors. The Court acknowledges that a party's non-use of peremptory challenges often is evidence tending to support a contention that it did not make discriminatory use of its strikes. *See United States v. Smith,* 324 F.3d 922, 927 (7th Cir. 2003) (discussing government's use of final peremptory challenge to strike white juror rather than the single remaining black juror). But in this case, it is not particularly strong evidence. Indeed, as discussed above, the government's failure to use available challenges to strike prospective jurors who met its stated key criteria for exclusion supports Stephens' argument that those criteria are being used as a pretext for prohibited discrimination. In addition, reliance on the fact that a party did not strike *every* juror of a particular racial or ethnic background as demonstrating the absence of discrimination would, if taken to its logical extreme, undermine the principle established by the Supreme Court in *J.E.B.* that the discriminatory use of even one peremptory challenge violates *Batson*. *Batson* does not require proof that a litigant systematically excluded minority jurors**.** *See United States v. James*, 113 F.3d 721, 728-30 (7th Cir. 1997). Each juror has an equal right to sit, *Powers v. Ohio*, 499 U.S. 400, 407-10 (1991); excluding any one juror in violation of the Equal Protection Clause requires a remedy under *Batson*. *James*, 113 F.3d at

---

[5] Juror 4 was the only member of a minority group who sat on the jury that heard the case. The defense struck Juror 13.

12

730 ("*Batson* demands that a prosecutor give a race-neutral reason every time he wants to peremptorily challenge an African-American person from the jury, no matter how many African-Americans remain."); *United States v. Ferguson*, 935 F.2d 862, 865 (7th Cir. 1991) ("It is the striking of a single black juror for racial reasons that invokes the shelter of the Equal Protection Clause, even though other black jurors are impanelled.").

The government has offered distinctions among the non-white collar, non-college degreed jurors that it contends make those who were not struck more desirable jurors from its perspective than those who were struck. But again, this misses the primary point. What the government has not explained, and cannot adequately explain, given its stated key criteria for jury selection, is why it failed to strike any of the remaining white jurors who met those criteria, even though it had enough strikes to eliminate at least some of them.

Though it is not essential to our conclusion that Stephens has proved his *Batson* claim, we also note that there is a significant body of research reflecting that when jurors may be affected in their deliberations by racial stereotyping, nominal minority representation on the jury is insufficient to overcome the potential for racial bias. We note first that contrary to the government's contention in its briefing on the *Batson* issue, race was, or at least could have been expected to be, an issue in this case. As the Seventh Circuit stated in its decision remanding the case, the jury "had to determine the credibility of an African-American defendant in characterizing his conduct as a white-collar employee, weighed against contrary testimony by Caucasian employees. There is no reason to believe that a jury would be immune to those racial stereotypes in determining or analyzing motives, or that a prosecutor would not see an advantage in an all-white jury in this case." *Stephens,* 421 F.3d at 515.

Social science research supports the proposition that in a case in which race and/or racial stereotyping may be an issue, "minority jurors must constitute a critical mass so as not [to] be overwhelmed by the majority." *See* D. Baldus, *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. Penn. J. Const. Law 3, 170 (2001) (citing R. Roper, *Jury Size & Verdict Consistency: A Line Has to Be Drawn Somewhere*, 14 Law & Society R. 977, 988 (1980); K. Klein & T. Klastorin, *Do Diverse Juries Aid or Impede Justice?*, 1999 Wisc. L. Rev. 553, 561; D. Wilder, *Homogeneity of Jurors: The Majority's Influence Depends Upon Their Perceived Independence*, 2 Law & Hum. Behav., 363 (1978)); S. Johnson, *Black Innocence and the White Jury*, 83 Mich. L. Rev. 1611, 1698 (1985) (citing studies); *see also,* J. Francis, *Peremptory Challenges,* Grutter, *and Critical Mass: A Means of Reclaiming the Promise of* Batson*, 29 Vt. L. Rev. 297, 330-31 (2005).[6] In the Court's experience, this notion is a matter of common understanding among trial lawyers.

The Court's finding that the government's stated primary criteria for exercising its peremptory challenges are lacking in credibility and have been used as a pretext for discrimination against racial and ethnic minorities leads us to conclude that Stephens has shown that the government violated *Batson* in exercising its peremptory challenges against one or more of the jurors from racial and ethnic minority groups that it struck. Because even one such strike requires an order for a new trial, this finding and conclusion requires the Court to grant Stephens' motion.

Though our analysis of the *Batson* issue logically could stop here, we will also address

---

[6] The Court cites these articles not to suggest agreement with the advocacy by the authors of some of them of a racial quota system of sorts for jury membership, but rather for their discussion of the "critical mass" issue.

certain of the government's arguments for distinguishing between the jurors it struck and those allegedly comparable. Some of those arguments are equally lacking in credibility, and equally pretextual, as the points we have already addressed.

*Jurors 9 and 21.* The government contends it struck Jurors 9 and 21, both Hispanic-American men, based on concerns they would be unable to understand the government's case. The government points to errors both jurors made on their written questionnaires and difficulties they had answering questions during oral *voir dire*. *See* Gov't Br., Ex. A at 20 (Juror 9: "going to scool for a carrer"), 43 (Juror 21: spouse is "Housewife not employed"); Tr. 47-48, 74-75.

Peremptory challenges based on mistakes on a jury questionnaire and concerns about the juror's ability to understand are considered race-neutral. *See United States v. Smith,* 324 F.3d 922, 927 (7th Cir. 2003). Stephens contends, however, that the government's stated reasons for striking Jurors 9 and 21 are pretextual, because the government accepted Juror 11, a Caucasian man, despite the fact that he also made mistakes on his written questionnaire and exhibited difficulty answering the Court's questions during oral *voir dire*. *See* Gov't Br., Ex. A at 23 ("Waltr" and "construstion"); Tr. 50-04.

Though the government attempts to distinguish between Juror 11 on the one hand and Jurors 9 and 21 on the other, it has again missed the point: because it had strikes left, it did not have to distinguish among these jurors. If the government truly was striking jurors who exhibited confusion and thus might not understand the government's case, then it also would have struck Juror 11. The government has failed to identify a persuasive rationale as to why Juror 11's apparent confusion was any less significant than that of Jurors 9 and 21. The Court finds that the "confusion" rationale, as applied to Jurors 9 and 21, is used as a pretext for

unlawful discrimination.

*Juror 36.* The government says it struck Juror 36, an African-American woman who had previously worked for the Chicago Police Department as a typist, because she exhibited difficulty answering the Court's questions during oral *voir dire,* and because her brother had been imprisoned for burglary. *See* Gov't Br., Ex. A at 37; Tr. 11-13. Stephens contends that the record reflects not that Juror 36 misunderstood the Court's questions but rather than she was joking. The following colloquy between the Court and Juror 36 consisted of follow-up on the juror's "yes" response to the written questionnaire's questions, "Have you every applied for a job with a law enforcement agency":

|  |  |
|---|---|
| THE COURT: | You applied for a job with law enforcement. This is obviously the police department. Is there any other job with law enforcement that you have applied for other than your job with the police department? |
| JUROR 36: | No. Maybe the sheriff. |
| THE COURT: | You may have applied for a job with the sheriff? |
| JUROR 36: | I would like to. |
| THE COURT: | You would like to. In a similar capacity, the same type of job you had with the police department? |
| JUROR 36: | I would like to be an officer. I would type for the police. |
| THE COURT: | Have you ever actually applied to be a law enforcement officer? Is that just something you have thought about? |
| JUROR 36: | Something I thought about. |

Tr. 110-12.

The Court is unpersuaded by Stephens' argument that Juror 36 was trying to make a joke. Based on our own observation of the proceedings, it appeared that the juror showed some slight

16

misunderstanding of the Court's question, "Is there any other job with law enforcement that you have applied for other than your job with the police department?"  It is true that some of the other prospective jurors laughed in reaction to Juror 36's responses, but that does not mean she intended a joke.

On the other hand, we cannot credit the government's contention that what was, quite obviously, apparent momentary confusion on the part of Juror 36 in response to an unexpected verbal inquiry by the Court put her in the same category as a person who made an error when responding to a written question.  The two situations cannot reasonably be said to be truly parallel:  the jurors were able to review the questions on the written questionnaire and prepare responses in their own time, as they were given whatever time they needed to respond; the Court's verbal questions were unexpected and had to be answered immediately (and the Court has a tendency to speak rather quickly, as our court reporter has often noted).  Juror 36's response on the written questionnaire was absolutely accurate; she *had* applied for a job with law enforcement – her typist job with the Chicago Police Department (as the Court pointed out during the oral *voir dire*).  The unexpected follow-up question we threw at her was a bit of a curve ball, or at least a hard slider - was there any *other* job with law enforcement for which she had applied?  The Court cannot, and does not, credit the government's contention that it struck Juror 36 due to confusion.  We find that this explanation is being used as a pretext for discriminatory use of the peremptory challenges.

In short, Stephens has established by a preponderance of the evidence the government's explanation of its strikes of Jurors 9, 21, and 36 is lacking in credibility and that those jurors were struck due to their race and national origin.  Even were the Court to have concluded, in our

earlier discussion, that the government's originally stated criteria were the criteria it actually applied, we would nonetheless find the government's exercises of peremptory challenges against these jurors violated *Batson*.

## A postscript

The Court recently participated in a project of the Seventh Circuit Bar Association that involved testing, in civil cases, various "innovations" in the jury process.  One of these involved the use of written questionnaires during the *voir dire* process as the primary means to obtain information to use in selecting the jury.  That particular practice was not actually an innovation; this Court (like others in this District and elsewhere) has been using written questionnaires as the primary element of jury *voir dire* in both civil and criminal cases for several years.  The Court's primary experience as a practicing lawyer trying civil and criminal cases was with oral *voir dire*, a practice that remains the norm in this District and elsewhere.  Our goal in moving to the use of written questionnaires was to obtain more information, more efficiently, from the jury *venire*.  Rather than each juror answering, one after the other, a series of identical verbal questions, all the prospective jurors can answer a set of written questions simultaneously.  This allows the same amount of information to be obtained in less overall time; it also permits more information to be obtained in the same (or less) time that it would take to conduct a more cursory oral *voir dire* – if extra inquiries are included in the written questionnaire.  In addition, research that suggests that all else being equal, jurors are more likely to answer written questions accurately and honestly than they do if required to respond to the same questions individually in front of a courtroom full of people, a process that prospective jurors often perceive as more intrusive and intimidating.  *See, e.g.,* Principles for Juries and Jury Trials 39 (Amer. Bar Ass'n 2005) (citing

G. Mize, *On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room*, 36 Ct. L. Rev. 10-15 (1999)).

Since moving to the use of written jury questionnaires, the Court has continued to use follow-up verbal questioning to supplement the *voir dire* process. In criminal cases, this has largely consisted of two things. First, we pose to the panel as a whole a series of questions of common application (for example, ability to serve given the anticipated length of the trial, willingness to follow jury instructions, etc.), with follow-up questions to jurors whose responses to the group questions call for further inquiry. And second, we pose follow-up questions to individual jurors to obtain elaboration on answers provided on their written questionnaires (for example, details of prior jury service, follow-up questions about jurors or relatives of jurors who work in law enforcement or have been arrested or charged with crimes).

This Court's experience is that the process we use allows us to obtain more information more efficiently than the more traditional method of oral *voir dire*. The goal of efficiency, however, is sometimes at odds with the goal of obtaining information that is appropriate and necessary to the intelligent exercise of peremptory challenges. A few jurors' written questionnaire responses do not call for much, if any, follow-up; the written responses of many jurors call for only minimal follow-up. Use of written questionnaires as the sole or predominant means of obtaining information from prospective jurors may result in the elimination or minimization of the opportunity to get a sense of how particular prospective jurors communicate and react verbally. That opportunity, if available, can give counsel valuable insight into whether, and how, the juror will understand the evidence in the case and the court's instructions on the law, and how the juror will relate to fellow jurors during deliberations.

Having used written questionnaires in dozens of jury trials over the past several years, the Court has come to believe that if handled properly, they are a better means of obtaining accurate factual information about prospective jurors that the more common and traditionally used verbal *voir dire* process.[7]  But if a judge's use of written questionnaires leads him or her to eliminate or drastically minimize verbal questioning of prospective jurors, this can, in effect, encourage counsel to see and assess the jurors as simply members of the various categories into which they fit – including, among others, racial and ethnic categories.  Some stereotyping is inherent in any jury selection process that is developed with efficiency in mind, but in this regard, some processes are "more equal than others."

To put it another way, there is always some tension between efficient trial management (which can degenerate into efficiency for efficiency's sake) and in-depth inquiry (which can degenerate into, as one of our colleagues has put it, "going for the capillary" as opposed to the jugular).  Overemphasis of the former can have the effect of encouraging stereotyping on the part of counsel.

The experience of this case is part of what informs our discussion of this point.  Review of the transcript of the jury selection process reveals, at least for some prospective jurors, precious little opportunity for counsel to observe the jurors communicating, interacting, and thinking on their feet.  The Court is constrained to say that the minimization of verbal interaction that resulted from how we conducted the *voir dire* in this case likely contributed to the use of a form of stereotyping in the jury selection process, which in the government's case, as we have found, included the use of racial and ethnic criteria in the exercise of its peremptory challenges.

---

[7]  This requires, among other things, the use of questions that are worded very simply.

**Conclusion**

For the reasons stated above, the Court grants Stephens a new trial.  The case is set for a status hearing on July 13, 2006 at 9:30 a.m. for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 9, 2006